[Civ. No. 1556.    Third Appellate District.—February 7, 1918.]

## BERTRAM W. COLE et al., Respondents, v. OLIVE J. MUGRIDGE, Appellant.

CONTRACT—TRANSFER OF PROPERTY—CARE AND SUPPORT FOR LIFE—ENFORCEMENT.—Contracts to transfer property in consideration of care and support for life are enforced without reference to the form or phraseology of the writing by which they are expressed.

ID.—BREACH OF CONTRACT—SUFFICIENCY OF EVIDENCE.—In this action for damages for breach of contract to convey land in consideration of personal care, attention, companionship, and consolation and furnishing defendant with necessary food during the remainder of her life, it is held that the evidence is sufficient to support the verdict in favor of the plaintiffs.

ID.—INSTRUCTION—MEASURE OF DAMAGES.—An instruction in such an action that in cases of bad faith the measure of damages would be somewhat different did not impute bad faith to the defendant, notwithstanding no issue of fraud, concealment, or bad faith was raised in the case.

APPEAL from a judgment of the Superior Court of Solano County. Henry C. Gesford, Judge Presiding.

The facts are stated in the opinion of the court.

Leon Samuels, for Appellant.

James H. O'Leary, and E. S. Bell, for Respondents.

CHIPMAN, P. J.—This is an action for damages for breach of an alleged contract entered into by plaintiffs, who are husband and wife, and defendant on or about March 11, 1914, by the terms of which it is alleged that in consideration of plaintiffs' giving defendant their personal care, attention, companionship, and consolation and furnishing defendant with necessary food during the remainder of her life, defendant would convey to plaintiffs a certain lot of land situated in the city of Vallejo, together with the dwelling-house thereon and the furnishings therein, defendant to reserve unto herself an estate in said property during her life, plaintiffs to reside with her in said dwelling-house on said premises, "free from rent, during the remainder of defendant's natural life."

It is alleged in plaintiffs' second amended complaint that on March 23, 1914, and for a long time prior thereto, plaintiffs resided in the county of Worcester, state of Massachusetts; that about March 23, 1914, plaintiffs departed from their former home in the said county of Worcester for the city of Vallejo, arriving in said city about April 14, 1914; that on said day defendant had not conveyed said property to plaintiffs in accordance with said contract or at all; that on or about March 11, 1914, and April 14, 1914, and at all times between said dates, plaintiffs were ready and willing to comply with the terms of said contract, and on April 14, 1914, at the said city of Vallejo, plaintiffs "offered defendant immediate compliance with the terms of said contract; but defendant then and there rejected plaintiffs' said offer of performance, and then and there refused to convey said property to plaintiffs in accordance with the terms of said contract, or at all, and then and there refused to allow plaintiffs to reside in said dwelling-house with or without the use of said furnishings, during the remainder of defendant's natural life, or during any other period free from rent, or other-

wise, or at all, and then and there refused to comply at all with the terms of said contract. By defendant's failure and refusal to comply with the terms of said contract as aforesaid, plaintiffs have suffered injury and damage as hereinafter alleged.'' That in order to comply with the terms of said contract on their part, plaintiffs were compelled to and did surrender a certain leasehold interest in certain land in said Worcester County, that had four years to run and which was yielding plaintiffs an annual profit of one thousand two hundred dollars and were obliged to pay the lessor the rents reserved, to wit, the sum of $480, to plaintiffs' damage in the sum of $5,280; that plaintiffs were for like reason obliged to sell, and did sell, certain farm implements and other personal property described, at a loss of $602; that in coming to California in order to comply with the terms of said contract, they incurred certain expenses, the items of which are enumerated, amounting to $329, and that to return to Massachusetts, the expense to plaintiffs will be a like amount; that plaintiffs were unemployed by reason of defendant's failure to perform on her part for a period of forty-eight days, resulting in plaintiffs' further damage in the sum of $240. The prayer of the complaint is for the sum of $6,781.70 and costs of suit. The complaint is verified. The answer consists of specific denials of the averments of the complaint, with the single exception that defendant admits that she would not convey said property to plaintiffs on or about the fourteenth day of April, 1914, or at any time. The cause was tried with a jury and plaintiffs had a verdict for one thousand five hundred dollars, for which amount the court entered judgment with interest from its date, September 2, 1915, and for costs fixed at $111.20.

Appellant says in her brief that the facts are ''extremely unusual,'' which may be said of most of the cases in this class, for it would be difficult to find any two alike in their facts. While this is true, it is also true, as was said in *Bruer* v. *Bruer*, 109 Minn. 260, [28 L. R. A. (N. S.) 608, 123 N. W. 813]: ''By the modern trend of authority these transactions are placed in a class by themselves and enforced without reference to the form or phraseology of the writing by which they are expressed.'' ,

The contract in question is chiefly derivable from letters exchanged between plaintiff, Mrs. Cole, and defendant, Mrs.

Mugridge. Mrs. Cole in her testimony thus explains how this epistolary correspondence sprang up: "I first learned of Mrs. Mugridge in March, 1910, in Vallejo. I met Mr. Mugridge, her husband, in Dr. Klotz's office at that time, when I was there with my husband. Mr. Mugridge spoke to us first and in the course of the conversation we found that Mr. Mugridge and I were from the same state, New Hampshire. We all left Dr. Klotz's office together and Mr. Mugridge walked with us as far as the St. Vincent Hotel, where we were stopping. He was very friendly to us and invited us to his home, at the same time telling us of his wife, who he said was also a native of New Hampshire. After that we met him about half a dozen times. He made two or three visits to us at our hotel and on each occasion invited us to come to his home; but we never did so. However, at his insistence, we did upon one occasion walk with him to the street corner near his home and he pointed it out to us. This is the same property which his wife later on promised to deed to us. About the last time he saw us, he asked my husband and myself to write to him, stating at the same time that his wife was very fond of postal cards, and asked us to send her some. About two weeks after meeting Mr. Mugridge my husband and I returned to New Hampshire. After our return to New Hampshire I wrote to Mr. Mugridge and his wife answered the letter, giving as her reason for doing so that her husband could not see to write. After this, at Mrs. Mugridge's request, I wrote to her directly and sent her some postal cards. This was the beginning of my correspondence with her and from then on many letters were exchanged between us."

At this time, 1910, defendant's family consisted of herself and husband and son. She was almost seventy-three years old; her husband several years older. He died some time prior to 1913 and her son also died in March of that year. The earliest letters are not in the record. Defendant introduced a letter written by Mrs. Cole of date January 1, 1913. There is nothing in this letter indicative of the wish on appellant's part to have respondents come to California or of respondents' entertaining any intention to do so. Defendant introduced another letter written by Mrs. Cole dated March 4, 1913, in which the writer expresses her sorrow on hearing of the accident to Mrs. Mugridge's son. She writes

of the griefs and troubles her own family is passing through
and asks forgiveness for inflicting them upon her friend, who
has so many of her own.   The next letter in order of time
is one dated December 28, 1913, from defendant addressed to
"My dear friends, Mr. and Mrs. Cole," partly written on
that date, partly on January 4, 1914, and January 6, 1914.
In this letter she dwells upon the death of her husband and
especially the death of her son, Charlie.   In this letter she
says that after the death of her husband she wanted to ask
Mrs. Cole if she ever thought of coming out to California
but "did not dare to," for fear she could not do her justice,
adding: "I don't know what will become of me if some body
dont come to my relief for I cant always do as I do now,
. . . if you ever want to come out here and can then write
me so I can think, then I will write you more. . . . I have
just got your New Years cards; how can you have so much
patience with me? yet if you was here you could see for your-
self all I can do is to thank you many times for all your
kindness."

On February 1, 1914, appellant wrote Mrs. Cole, among
other things saying: "Would it be any temptation to you to
come to California if I should tell you I would give you my
home with what is in it. I have got to have some one and of
course it wont be long that I shall need any one or anything,
there are many who would come and be glad to, but I am
afraid to ask any and if you are the kind of people I think
you are I would gladly do all I could for you.   Now think
this matter over and write me and ask me anything you want
to know and I will try to explain anything and everything
and if it don't strike you favorably it will be all right and
if it does ask any questions you want to, and I will try to
answer satisfactorily."

Appellant wrote again February 16, 1914, in which she
takes up the matter of respondents' coming to California,
saying, among other things: "I will willingly give my home
to you and it is not likely I shall trouble anybody long for
I am 76 years old, and it is not every one that reaches that
age . . . ; don't put any money into that field of potatoes
but save it to come out here with, that is if you would like
to come and I certainly would like for you to come; all you
would have to do for me is to board me and take care of me
a little and if I should get so I could not do for myself I

will hire a nurse. My property is not involved in any way only with street work paving and so fourth which I have money to pay and I am trying every way to keep squair so as not to die in debt.'' Again, in the same letter, she says: ''Just dispose of what you have and get ready and come right along and you will find everything on the squair for I could never take advantage of anyone much less one who is so kind as I think you and your husband are and you will find me just what I say, to be sure we have never seen each other, and I do hope we neither of us will ever be sorry for what we are trying to bring about.''

In another letter of February 22, 1914, she describes to respondents her home, saying among other things: ''I do hope you will come, you will never get another chance like it, you never will find a home ready for you, I have been thinking of you all day and thinking what I wanted to tell' you and I want you to come while I am living.''

Again, on March 3, 1914, she wrote to respondents: ''I hope you will come soon and hope that we shall all be spaired to enjoy each others companionship.'' And in the same letter she said that she had not mentioned the matter to anyone, for it would be time enough when the respondents came to her. ''I think I will have a deed made out to you and your husband to take effect at my death or would you rather I would wait till you get here? You answer this as soon as you get this letter, this house is insured for three years, and there is no incumberance on it anyway only as I told you in the first letter the street work and I have money in reserve for that purpose.''

In a letter of March 11, 1914, she says: ''I am going out this afternoon to look after your interests and if you come and I sincerely hope you will, I shall do all I can to make us happy.'' The day following, March 12, 1914, she writes advising against bringing any furniture, saying: ''If I were in your place I would bring the traveling expenses down as low as possible for perhaps if you stay here till I am gone you will want to sell out and go East again, so perhaps it would be well to store it if you want to keep it.'' On March 14th she wrote again: ''I have not spoken to anyone about you and shall not for if anything should happen which I do hope will not, everybody would blame me for taking up with strangers, but I put confidence in you both if you are

strangers, I hope we wont always be . . . I will close now hoping to see you soon; write me and make a rough guess if not very accurate what time you will start and if I dont have everything done be assured it is not my fault. . . . P. S. Dont worry the Deed is all right don't say anything. I don't wonder you cried over your cow and calf, I should cry over chickens and pigs, or anything that had life that I had.''

On March 22d she wrote Mrs. Cole again, addressing her as follows: ''My dear niece or daughter or whatever you want to call me,'' in which she expresses the hope that they will be happy when they are all together. On March 23d she writes Mrs. Cole again, expressing the hope that they have done right in regard to the Coles coming to California, adding: ''I am willing and will do what I said I would if you come and I hope you will and that neither of us will be disappointed with the other, now what I write is for both your and my good so please take it so, I should feel very bad to have you come out here and find things not as well as you expected.''

On February 10, 1914, Mrs. Cole wrote to appellant acknowledging the receipt of a letter from appellant, stating: ''Dear friend, do you mean that if we would go and take care of you and be kind to you as long as you lived that you would give me your home for myself? . . . I would like to live there very much. I liked it when I was there. Of course, I should have to know just what you thought best to do before we gave up our place here. We only leased it, as I wrote you, but it was a chance one would seldom find, and the stock is ours what there is of it, and it is all we have in the world.'' She asks her ''Aunt Mugridge'' to think the matter over, for as the planting season was coming on they would have to know what they were going to do. ''Of course we would not want to sell our stock to pay our way out there and lose all we had here, unless we were sure of the place. I know we would do all in our power for you to help you and to make the sunset of your life as contented as possible after such a loss. It means a great deal to us all and I only hope we may all live to thank God for bringing us together in mutual help. Now, you too, write me just what you mean and think best to do. If I could afford it I would go out and talk with you myself, but it is

more than I can do. We know each other pretty well, now, don't we? I shall have this on my mind until I know."

On February 25th Mrs. Cole again writes Mrs. Mugridge acknowledging the receipt of her letter, stating: "I received your welcome letter today, and I am all excitement myself. I believe it will mean more happiness for us all. It was quite a decision for me, because it meant so very much, for you see, we shall not have anything, practically, left, after we pay our fare out there. It will cost about two hundred dollars, but Auntie, I know you are true and would not let us give this chance up here, only to lose all. . . . Of course, I would not expect you to give me your home until you knew us, but I am sure you would do what was right under the circumstances. It will take a little time to dispose of all our stock but we will do it as quickly as we can. I hesitated a little at first, because I knew if we gave this place up, we never would find again the chance we had here. . . . I want to say too, that it is not because you have a home and a little money alone, that I am going to you, it is both because I want a home and believe I can make you happier, Auntie, too, in your last years. It must have been meant to be so. I hope nothing happens in any way to any of us before we get together and try and find a little comfort for you."

On March 4, 1914, Mrs. Cole writes to Mrs. Mugridge: "Started packing yesterday. One room done. Mr. C. Packs everything in burlap and paper. . . . Keep up courage, Auntie, we will be there before very long now. I dread to see my animals go and break up but I hope we shall all be happy there together."

On March 9th she writes again, acknowledging the receipt of a letter from Mrs. Mugridge, among other things, saying: "Auntie, if you feel perfectly willing I should feel pleased to have you make out the deed. God knows I do not anticipate anything happening to you, Auntie, but it would be almost like insuring us."

On March 16th she wrote reporting progress in her preparations for going to California and acknowledging the receipt of a letter from Mrs. Mugridge. On March 19th she wrote again, acknowledging the receipt of another letter and stating that they were about through packing, and on March 24th she wrote again at some length describing the many things she had to do in disposing of their property, closing

as follows: "We will all be together soon now I hope and then we can both find comfort, sympathizing with each other and I think it will help us both. Don't try to do too much Auntie and keep as well as you can. We both send you sincere love until we can see you, which will be soon now."

On April 2d she wrote: "I sent a letter to you yesterday but will send you a few words more today to tell you that we have secured our tickets and will leave for Cal. (and you) April 8th on a Wednesday and the trains are scheduled to arrive Monday night, April 13th, in San Francisco. . . . We will all be together soon now. Yes, it was a great decision for us all, but I am sure it was for the best, because we both mean to do right by each other, and we did need each other, didn't we? No, Auntie, I never thought you were rich, and you never misrepresented anything to me. What I did want was a home, and I was willing to do all we could for you in return for yours."

This ends the correspondence so far as shown in the record. Plaintiffs called upon the defendant at the trial to produce all the letters written by Mrs. Cole to the defendant, but the defendant stated that she could find no others except the ones already referred to. Mrs. Mugridge wrote very volubly and with great frankness and apparent sincerity as did also Mrs. Cole. · We think an examination of the letters, taken in their entirety, will show quite satisfactorily that the defendant was not only willing but very anxious to bring about the coming of Mr. and Mrs. Cole to California to live with her and care for her upon the terms substantially as set out in the complaint, and that the plaintiffs came to California induced thereto by the representations and promises made by the defendant, and that they would not otherwise have broken up their home in Massachusetts.

The defendant in her answer makes no claim of fraud or false representations or concealments on the part of plaintiffs, and aside from the fact that Mrs. Mugridge was laboring under a feeling of great loneliness and sorrow because of the loss of her husband and son, there is nothing in the record tending to show that she was not possessed of average mental faculties or did not fully understand what she was doing.

Mrs. Cole testified: "When we arrived in Vallejo, in April, 1914, we went direct to Mrs. Mugridge's house and Mrs. Mug-

ridge came to the door; that was the first time any of us had met. We had lunch there and the first thing she said was, 'We have all done wrong. We have made a mistake.' We asked her what she meant by this and she told us that she meant that she should not have promised us her home and should not have had us come to California. We tried to convince her that it was all right and that we would all be happy together and asked her to place the deed she had made to us in escrow and to keep her promise to us, but she refused to do so. We stayed there from April 14, 1914, to May 27, 1914, and during this time we often tried to point out to her what a great wrong it would be for her not to keep her promise to us under the circumstances, and often asked her to place the deed to the property in escrow, but she said she did not want to do so; that her husband had told her never to part with any of her property. We did everything we could to keep our promise to her and were always ready and willing to do so. While we were at her house we did everything in our power to make her happy and make it pleasant for her, assisting her in every way we could about the house and during this time bought most of the provisions for the house. We finally became satisfied that Mrs. Mugridge had no intention of keeping her promise to us; that she did not want us in her house, and so on May 27, 1914, we moved away from there. We inquired of Mr. Madren and he told us he had prepared a deed for Mrs. Mugridge in which she deeded the property at 412 Carolina Street, Vallejo, to myself and my husband. This is the same property involved in this suit and which she promised to give us. I wrote Mrs. Mugridge many letters which she has not produced here. We did start packing some of our small things about March 4, 1914, but we were sure at this time from what Mrs. Mugridge had said to us in her letters that the agreement in question would be entered into. We did not finish packing our stuff and getting it away from our farm and stored until about March 19, 1914.''

Mr. Madren, the person referred to by Mrs. Cole, testified that he was a notary public in and for the county of Solano. ''On March 11, 1914, at the request of Mrs. Mugridge, I prepared a deed of her house and lot at 412 Carolina Street. I gave this deed to Mrs. Mugridge. My record shows deed dated March 11, 1914, executed by Olive J. Mugridge to

Bertram and Edna Cole. The deed was a grant, bargain, and sale deed, and the consideration named was ten dollars.''

The defendant, Mrs. Mugridge, testified that when the plaintiffs came to her house, she said to them: ''We had all made mistakes, and I made a mistake in sending for them and they had made a mistake in coming. The deed was mentioned and I said I had a deed made out, and they said, 'Why don't you put it in escrow?' and I said: 'I can keep it just as well myself, but for all that if you stay here and do what is right, at my death you shall have my home'; but during the time they were at my house they did nothing for me and contributed nothing to my household expenses, but they lived at my house mainly at my expense. I refused to give them any deed and they wanted a deed, and such request was made several times.''

In rebuttal, Mrs. Cole testified that ''Mrs. Mugridge did not say on the occasion of our first visit to her home in 1914, while we were having lunch, that if we would stay with her and do what was right we should have her home at her death. While we began packing some of our furniture before the letter came in which Mrs. Mugridge said she had had the deed made, we did so because we felt from the way she had written in her letters that the agreement between her and us would be entered into.''

There was some evidence as to the value of the premises, plaintiffs' witnesses placing it at twenty-seven or twenty-eight hundred dollars.

Defendant contends that no contract was entered into because ''there never was any meeting of the minds of the parties to the alleged contract and the most that can be said in favor of the claim of respondents is that there was a mere suggestion, not an offer or proposal . . . accepted merely as a suggestion and in the hope that ultimately they would attain their object.'' As we read the letters, we find in them a definite offer made by appellant definitely accepted and acted upon by respondents. After respondents had notified appellant that they were disposing of their property and preparing to come to California in compliance with appellant's request and as the letters show, in the belief that appellant would do as she had promised, appellant wrote to hasten their coming and these urgent messages continued until late in March, 1914, and on March 11th she executed a deed of

the property to respondents and so informed them by letter. On respondents' arrival at appellant's house, and without waiting to see whether her hopes of a happy life with them would or could be realized, appellant promptly told them a mistake had been made—she "had made a mistake in sending for them and they had made a mistake in coming," and her attitude remained unchanged toward respondents until they were compelled without fault of theirs, so far as the record shows, to quit the premises.

We do not think it necessary to resort to the books to justify us in holding that there was ample and legal support for the verdict of the jury.

It was not error of the court to refuse to instruct the jury, as requested by defendant, that there was no contract between the parties. Defendant requested an instruction designated as No. 5, upon the measure of damages, and states that while substantially given in another instruction by the court, the court erred in stating that "in cases of bad faith the measure of damages would be somewhat different." The court then adds: "In this case no specific price for the property having been alleged or proven to have been paid or agreed upon under the alleged contract or expenses incurred in examining title or preparing papers, you can make no allowance to plaintiffs on account of these items, notwithstanding you may find the contract to have been made and broken as alleged; and under such circumstances your verdict cannot exceed in amount the value of the property in controversy at the time of the breach of contract, if you find there was such a breach of contract, irrespective of any sum or sums of money which plaintiffs may have expended or expenses they incurred prior to the time plaintiffs took up their residence with defendant on or about April 14, 1915, unless you find from the evidence that any such sum or sums of money were properly paid out or such expenses were properly incurred in preparing to enter into possession of the premises in controversy." The objection urged is that the court "distinctly instructed the jury that there was bad faith on the part of appellant, and also that the jury was not, under the circumstances, confined to rendering a verdict for the price paid and the expense properly incurred in examining the title and preparing the necessary papers, but could render a verdict up to the amount of the value of the

property.'' It is true that no issue of fraud, concealment, or bad faith was raised in the case, but we do not think the instruction complained of can reasonably be said to have imputed bad faith to appellant or that the jury could have so understood the instruction. In point of fact, the verdict was less than the evidence showed was the value of the property. The instruction excluded as matter of damages all expenses incurred prior to the time plaintiffs took up their residence with the defendant. We cannot perceive any prejudicial error in the instruction.

No other error is specified. Defendant states "that the instructions given by the court were on the whole fair and unobjectionable."

The judgment is affirmed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court, April 4, 1918.